**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

DIANE WILSON,                                    Case No:_____

     Plaintiff,

v.

CITY OF GAINESVILLE,

     Defendant.

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, DIANE WILSON, by and through the undersigned counsels, hereby files this Complaint against CITY OF GAINESVILLE, and states as follows:

## NATURE OF CLAIMS

1.     This is an action for rights secured pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C §2000e et. Seq. ("Title VII"), as amended  and Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes ("FCRA")

## JURISDICTION

2.     Jurisdiction is conferred on this Court by 28 U.S.C. §§1331 and 1343(a). Declaratory relief is authorized under 28 U.S.C. §§2201 and 2202.

## VENUE

3.     Venue exists in the Northern District of Florida, Gainesville Division, under 28 U.S.C. §1391 (b), as all events pertinent hereto occurred in Alachua County, Florida.

## THE PARTIES

4.     Plaintiff is a  natural persons and at all times relevant to this action was an

employee of the CITY OF GAINESVILLE.

5.      Plaintiff, DIANE WILSON ("WILSON") , is a resident of Alachua County and she is a citizen of the United States of America.

6.      At all times relevant to this action, Plaintiff was an employee of Defendant.

7.      CITY OF GAINESVILLE is a State of Florida governmental entity and an "employer" as defined by Title VII and Florida Civil Rights Act of 1992, transacting business and performing services in Alachua County.

## EXHAUSTIVE OF ADMINISTRATIVE REMEDIES

8.      Prior to filing of this action, Plaintiff filed a Charges of Discrimination, which was dually filed with the Equal Employment Opportunity Commission (hereinafter "EEOC"). The EEOC issued a Right to Sue Notice with regard to the Charge of Discrimination.

9.      This Complaint has been timely filed within the ninety (90) day time limitation. The Right to Sue Notice is attached hereto as Composite Exhibit "A."

## STATEMENT OF FACTS

10.     WILSON has been an employee with the CITY OF GAINESVILLE for approximately twenty (20) years; having received glowing evaluations and having worked her way up to Assistant Finance Director, being appointed the Interim Finance Director in 2018, where she remained until 2019.

11.     The then Interim City Manager, Deborah V. Bowie, opted to await the hiring of the permanent City Manager before permanently filling the Finance Director position.

12.     LEE FELDMAN ("FELDMAN") joined the CITY OF GAINESVILLE in November of 2019 as the City Manager.

13.     Shortly after FELDMAN'S hire he initiated a reorganization of City Departments and offices.

14.     FELDMAN's negative views of female employees became readily apparent during the reorganization wherein he often approached subordinates of female supervisors and managers, offering them new roles as part of the reorganization without consulting with the female supervisors and managers. FELDMAN was more inclusive and respectful of male supervisors and managers; consulting them about his proposed changes.

15.     FELDMAN went on to move the budget division to his direct report, which fell within WILSON'S purview as the Interim Finance Director.  FELDMAN did not include WILSON in said process.

16.     As part of the reorganization, FELDMAN approached WILSON'S subordinate, Budget Manager Karen Fiore; telling her that she would no longer report to WILSON, however, he instructed Ms. Fiore not to tell WILSON of their conversation.

17.     In or about December 2019, both WILSON and Andrew Persons filled Interim roles with the CITY OF GAINESVILLE; WILSON as Interim Finance Director and Mr. Persons as Interim Director for Department of Sustainable Development.

18.     FELDMAN opted to direct hire Mr. Persons to permanently fill the position of Director for Department of Sustainable Development, while WILSON'S position was subjected to the competitive process, including positing the position and undergoing the interview process.

19.     Numerous Assistant City Managers, including the City's Human Resource Director, Lisa L. Jefferson informed FELDMAN that it would be inappropriate to direct hire Persons, but not WILSON.

20.     FELDMAN went as far as to tell Mr. Persons that he would be hiring him for the permanent Director position, absent a competitive and interview process.

21.     Soon after his hire, FELDMAN communicated to many staff members that he believed WILSON to be skilled and knowledgeable as the Interim Finance Director and absent another candidate being able to "walk on the moon", the permanent Finance Director position should go to WILSON.

22.     On or about January 14, 2020, WILSON filed a written complaint of gender discrimination with the CITY OF GAINESVILLE, with regard to the above referenced conduct of FELDMAN. A true and correct copy is attached hereto as Exhibit "B"

23.     FELDMAN acknowledged receipt of the complaint of gender discrimination.

24.     Within weeks of receiving notice of WILSON'S complaint, FELDMAN rushed to initiate the hiring process for the permanent Finance Director.

25.     FELDMAN selected Colin Baenziger & Associates, whom FELDMAN shared a prior relationship to oversee the application and recruitment process.

26.     In an e-mail, from Ms. Lisa Jefferson, the Human Resource Director indicated that it was in fact FELDMAN who selected the Baenziger Firm.

27.     Assistant City Manager Deborah V. Bowie, Risk Management Director Steve Varvel and the City Manager's Office Coordinator Zanofra "Zanni" Lynch were all surprised that the Baenzinger Firm was selected, as the City Commission was not

pleased with the quality of their services; including the recruitment process for which FELDMAN was selected.

28.    Mr. Baenzinger soon e-mailed WILSON informing her that his Firm had been retained to find "her replacement."

29.    FELDMAN changed the usual job description in the City's advertisement for the Finance Department position,  adding  criteria to exclude WILSON, which included, but was not limited to adding Certified Public Accountant as a requirement.

30.    FELDMAN also included disparaging remarks, referring to the running of the Finance Department under WILSON'S leadership.

31.    WILSON was denied the opportunity to provide references, while other candidates were offered opportunities to do so.

32.    Prior to the completion of the selection process, FELDMAN told Ms. Bowie that he was leaning towards hiring an applicant, Cynta Ramos for the permanent Finance Director position.

33.    Assistant City Manager Frederick Murray played an integral role in the selection process for the permanent Finance Director, as it was understood that he would have final say in the selection for that position.

34.    Assistant City Manager Murray was charged with finalizing the selection process and to fill the position as the Finance Director reported to him.

35.    The scores differentiating Ms. Ramos and WILSON was one point; in favor of Ms. Ramos, however, when viewing WILSON'S work history, her job performance, the need for consistency during the pending audit, he selected WILSON for the position.

36.     FELDMAN, in retaliation for WILSON having filed the complaint of discrimination against him rejected Mr. Murray's selection and hired Ms. Ramos.

37.     WILSON amended her gender discrimination complaint with the City to include allegations of retaliation.

38.     The City's Office of Equal Opportunity retained the law firm of Shuffield, Lowman & Wilson, P.A. to conduct an investigation into WILSON'S allegations.

39.     After approximately 12 months, the Final Investigative Report was released to the City Commission wherein it was concluded that FELDMAN unlawfully retaliated against WILSON. A true and correct copy of the Final Investigative Report is attached hereto as Exhibit "C".

40.     Attorney Robert Clayton Roesch of Shuffield determined that "there is cause to believe that Feldman retaliated against Wilson for filing a complaint of gender discrimination and that a violation of City policy occurred." See p. 35 of Final Investigative Report.

41.     Mr. Roesch further stated in his recommendation that "Policy EO-5 provides that the City will take corrective action that is effective and appropriate…The undersigned notes that retaliation is a serious offense…Considering the foregoing, the undersigned recommends the City terminate the Respondent's [FELDMAN'S] employment. Id at P. 36.

42.     The City Commission, having reviewed the 37 page Final Investigative Report, took no corrective action and rejected the Report in its entirety. In doing so, the City Commission ratified, approved and adopted FELDMAN'S unlawful conduct as its own.

43.     The City Commission, collectively, made disparaging remarks about the equal opportunity filing process and those whom filed complaints. The Commission's conduct did and continues to chill protected activities.

## COUNT I
## PLAINTIFF'S CLAIMS FOR UNLAWFUL GENDER DISCRIMINATION PURSUANT TOTITLE VII OF CIVIL RIGHTS ACT

44.     Plaintiff incorporate by reference Paragraphs 1 through 43.

45.     This action is brought pursuant to Title VII of the Civil Rights Act.

46.     Plaintiff has been treated differently based upon her gender in not having the same opportunity to advance her career as Persons, a male colleague.

47.     During times relevant to this Complaint, FELDMAN established a clearer and easier path to the Director position for male employees and instead created roadblocks for stricter standards for WILSON, a female employee.

48.     FELDMAN, acting on behalf of Defendant, deprive WILSON of the Finance Director position.

49.     During all times relevant to this action, a similarly situated male employee received preferential treatment as to the terms and conditions of his employment.

50.     Defendant engaged in unlawful discrimination of Plaintiff because of her gender as set forth above

51.     As a direct and proximate result of Defendant's willful, knowing, malicious and intentional discrimination, Plaintiff was treated disparately and in a discriminatory manner on account of her  protected classifications

52.     Plaintiff was deprived of her rights guaranteed by law.

53.     Said acts of discrimination by Defendant, as set forth above, have caused and continue to cause Plaintiff past and ongoing damages, including, but not limited to, actual damages, loss of past and future earnings, employment benefits and job opportunities, mental anguish, embarrassment, and humiliation.

**WHEREFORE**, Plaintiff seeks an order prohibiting the discriminatory practices set forth above, an order awarding front pay, back pay, compensatory damages, pre and post judgment interest, damages for emotional distress, humiliation, attorneys' fees and costs and any other relief that this Court deems is just and proper.

<u>COUNT II</u>
<u>PLAINTIFF' CLAIMS FOR GENDER DISCRIMINATION PURSUANT</u>
<u>FLORIDA'S CIVIL RIGHTS ACT</u>

54.     Plaintiff incorporate by reference Paragraphs 1 through 43.

55.     This action is brought pursuant to Chapter 760 of Florida's Civil Rights Act.

56.     Plaintiff has been treated differently based upon her gender in not having the same opportunity to advance her career as Persons, a male colleague.

57.     During times relevant to this Complaint, FELDMAN established a clearer and easier path to the Director position for male employees and instead created roadblocks for stricter standards for WILSON, a female employee.

58.     FELDMAN, acting on behalf of Defendant, deprive WILSON of the Finance Director position.

59.     During all times relevant to this action, a similarly situated male employee received preferential treatment as to the terms and conditions of his employment.

60.     Defendant engaged in unlawful discrimination of Plaintiff because of her gender as set forth above

61.     As a direct and proximate result of Defendant's willful, knowing, malicious and intentional discrimination, Plaintiff was treated disparately and in a discriminatory manner on account of her  protected classifications

62.     Plaintiff was deprived of her rights guaranteed by law.

63.     Said acts of discrimination by Defendant, as set forth above, have caused and continue to cause Plaintiff past and ongoing damages, including, but not limited to, actual damages, loss of past and future earnings, employment benefits and job opportunities, mental anguish, embarrassment, and humiliation.

**WHEREFORE**, Plaintiff seeks an order prohibiting the discriminatory practices set forth above, an order awarding front pay, back pay, compensatory damages, pre and post judgment interest, damages for emotional distress, humiliation, attorneys' fees and costs and any other relief that this Court deems is just and proper.

<u>**COUNT III**</u>
<u>**RETALIATION CLAIM PURSUANT TO TITLE VII OF THE CIVIL RIGHT ACT**</u>

64.     Plaintiff incorporates by reference Paragraphs 1 through 43.

65.     This is an action for unlawful retaliation pursuant to Title VII of the Civil Rights Act.

66.     During times relevant to this Complaint, WILSON engaged in protected activities, including, but not limited to filing an internal complaint of gender discrimination with the CITY OF GAINESVILLE.

67.     FELDMAN was aware of WILSON having engaged in protected activities.

68.     FELDMAN, acting on behalf of Defendant, deprive WILSON of the Finance Director position.

69.     WILSON suffered adverse employment actions as a result of her protected activities.

70.     Defendant engaged in unlawful retaliation of WILSON because of her engaging in protected activities as set forth above

71.     WILSON has continued to be retaliated against, which has included, but was not limited to, continuing to strip WILSON of her job duties, removing her direct reports, etc.

72.     As a direct and proximate result of Defendant's willful, knowing, malicious and intentional retaliation, on account of her protected activities

73.     Plaintiff was deprived of her rights guaranteed by law.

74.     Said acts of retaliation by Defendant, as set forth above, have caused and continue to cause Plaintiff past and ongoing damages, including, but not limited to, actual damages, loss of past and future earnings, employment benefits and job opportunities, mental anguish, embarrassment, and humiliation.

**WHEREFORE**, Plaintiff seeks an order prohibiting the discriminatory practices set forth above, an order awarding front pay, back pay, compensatory damages, pre and post judgment interest, damages for emotional distress, humiliation, attorneys' fees and costs and any other relief that this Court deems is just and proper.

## <u>COUNT VI</u><br><u>RETALIATION CLAIM PURSUANT TO FLORIDA'S CIVIL RIGHT ACT</u>

75.     Plaintiff incorporates by reference Paragraphs 1 through 43.

76.     This is an action for unlawful retaliation pursuant to Florida's Civil Rights Act.

77.    During times relevant to this Complaint, WILSON engaged in protected activities, including, but not limited to filing an internal complaint of gender discrimination with the CITY OF GAINESVILLE.

78.    FELDMAN was aware of WILSON having engaged in protected activities.

79.    FELDMAN, acting on behalf of Defendant, deprive WILSON of the Finance Director position.

80.    WILSON suffered adverse employment actions, including the denial of the Finance Director position,  as a result of her protected activities.

81.    WILSON has continued to be retaliated against, which has included, but is not limited to, continuing to strip WILSON of her job duties, removing her direct reports, etc.

82.    Defendant engaged in unlawful retaliation of WILSON because of her engaging in protected activities, as set forth above

83.    As a direct and proximate result of Defendant's willful, knowing, malicious and intentional retaliation, on account of her protected activities

84.    Plaintiff was deprived of her rights guaranteed by law.

85.    Said acts of retaliation by Defendant, as set forth above, have caused and continue to cause Plaintiff past and ongoing damages, including, but not limited to, actual damages, loss of past and future earnings, employment benefits and job opportunities, mental anguish, embarrassment, and humiliation.

**WHEREFORE**, Plaintiff seeks an order prohibiting the discriminatory practices set forth above, an order awarding front pay, back pay, compensatory damages, pre and post

judgment interest, damages for emotional distress, humiliation, attorneys' fees and costs and any other relief that this Court deems is just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 (b) Federal Rules of Civil Procedure, Plaintiff  hereby demand a trial by jury.

DSK Law
De Beaubien, Simmons, Knight,
Mantzaris & Neal, LLP

*/s/ Lindsay N. Greene*
**Lindsay N. Greene, Esquire**
Florida Bar No. 269610
332 N. Magnolia Avenue
Orlando, Florida 32801
Phone: (407) 422-2454
Facsimile: (407) 849-1845
lgreene@dsklawgroup.com
pnettles@dsklawgroup.com
*Attorneys for the Plaintiff*

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

October 12, 2021

Ms. Diane Wilson
c/o Lindsay N. Greene, Esquire
DSK Law
332 North Magnolia Ave.
Orlando, FL  32802-0087

Re:  EEOC Charge Against City of Gainesville
     No. 510202002512

Dear Ms. Wilson:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC Miami District Office, Miami, FL.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Kristen Clarke
Assistant Attorney General
Civil Rights Division

by        /s/ Karen L. Ferguson
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: Miami District Office, EEOC
   City of Gainesville

Exhibit "A"



FOR OFFICE USE ONLY:

COMPLAINT #:_____

## COMPLAINT OF DISCRIMINATION

**COMPLAINANT:**                VS                **RESPONDENT:**

Diane M Wilson                                    Lee Feldman, City Manager
3454 NW 50th Ave                                 200 E. University Ave
Gainesville                                       Gainesville
352-359-3719

**THE ALLEGATION OF DISCRIMINATION IS BASED UPON: (CHECK ALL THAT APPLY)**

___ SEXUAL ORIENTATION      ___ AGE                ___ DISABILITY
___ RACE                    ___ RELIGION           ___ GENDER IDENTITY
___ COLOR                   ___ NATIONAL ORIGIN    ___ RETALIATION
_X_ GENDER                  ___ MARITAL STATUS

**TYPE OF COMPLAINT:**

_X_ FORMAL        ___ INFORMAL

**TYPE OF ALLEGATION:**

___ HOUSING   _X_ EMPLOYMENT   ___ PUBLIC ACCOMMODATION   ___ FAIR CREDIT

___ OTHER (PROGRAMS/SERVICES)

**IF ANY OF THE FOLLOWING APPLY, PLEASE CHECK, ONLY, IF YOUR COMPLAINT IS BASED ON ONE OF THE ABOVE PROTECTED CHARACTERISTICS:**

___ Harassment                    ___ Hostile Work Environment

Disparate treatment

Date of most recent discriminatory action:_____

The reason the Respondent gave for the alleged discriminatory action (eg: no work, downsizing, company

closing, etc.) _____

_____

The reason I believe the action is discriminatory: A male co-worker and
I have each been in interim director positions
for approximately the same amount of time.

EXHIBIT "B"

Revised: 12/2018

He is being direct hired into the permanent position whereas I have to participate in a Competitive position with an executive recruiter. Additionally, the city Manager has circumvented me and advised my staff of their movement via a reorganization, telling staff not to tell me of the change. My female counterparts have experienced the same while male directors have not.

**Personal harm suffered (ex: loss wages, increased rent, emotional distress, moving expenses, or any other expenses, embarrassment, having to do business elsewhere):** Emotional distress of being treated unfairly and seeing my female counterparts experiencing the same. Potential financial impact.

**What is your desired resolution?** Direct placement if it is given to my peer (who is the only other interim director) and fair treatment to all of staff.

I will advise the Office of Equal Opportunity if my address or telephone number changes and I will cooperate fully with them in the processing of my complaint in accordance with their procedures.

Note: During the investigation of a complaint, the Office of Equal Opportunity is neither an advocate for the Complainant or the Respondent.

I declare under penalty of perjury that the foregoing is true and correct.

**NOTARIZED SIGNATURE**

_Cinnie M Wilson_ — 1/13/20
(COMPLAINANT)

STATE OF FLORIDA
COUNTY OF ALACHUA

BEFORE ME, the undersigned authority, personally appeared _____ to me well-known (or who produced _____ as identification), and s/he acknowledged before me that s/he is the person who signed the above and foregoing complaint.

WITNESS my hand and seal of my office, _____ County, Florida this _____ day of _____, A.D.,

_____
Notary Public, State-at-Large

My commission expires: _____

CITY OF GAINESVILLE OFFICE OF EQUAL OPPORTUNITY
222 E. UNIVERSITY AVE., 2ND FLOOR
OLD LIBRARY BLDG
P.O. BOX 490, STATION 52
GAINESVILLE, FL 32627-0490

Revised: 12/2018

# FINAL INVESTIGATIVE REPORT
Prepared by Shuffield, Lowman & Wilson, P.A.

EO-I-2020-12
EO-I-2020-20
Complainant: Diane Wilson
Respondent: Lee Feldman

## BACKGROUND

On January 14, 2020, Diane Wilson (the "Complainant" or "Wilson") filed a formal complaint of gender[1] discrimination and retaliation against Lee Feldman (the "Respondent" or "Feldman"). On May 13, 2020, Wilson filed a second complaint asserting retaliation for filing the first complaint. The undersigned conducted an internal investigation to gather information, evaluate the Complainant's claims, determine whether there is cause to believe the allegations against the Respondent are true, and make recommendations.[2]

At the time of the filing her complaints, the Complainant was employed by the City as the Interim Finance Director and was employed in that role from November 2018 until July 2020. Prior to that, the Complainant was employed with the City as the Assistant Finance Director. As the Interim Finance Director, the Complainant reported directly to Assistant City Manager, Fred Murry, as a result of the reorganization discussed below. Previously, the Complainant reported to Interim City Manager, Deborah Bowie, and then the Respondent. The Respondent began his employment as the City Manager in November 2019. The Complainant is female, and the Respondent is male.

## COMPLAINT

The Complainant filed a written complaint of gender discrimination with the City on January 14, 2020, and alleged that: (1) she was treated differently than a similarly situated male co-worker concerning permanent placement after serving in an interim director role; and (2) her authority was circumvented by the Respondent who directly advised her subordinates regarding a City reorganization and asked them not to tell the Complainant. The Complainant has also alleged that the Respondent engaged in other inappropriate behavior that is unethical or unprofessional or violative of City policies and procedures.

---

[1]      Gender discrimination in this report refers to discrimination based upon sex.

[2]      The investigation was conducted jointly with the investigation into Complaint number EO-I-2020-11.

EXHIBIT "C"

On or about May 13, 2020, the Complainant filed a separate written complaint of retaliation alleging that she was denied a promotion from Interim Finance Director to Finance Director as retaliation for filing her complaint of gender discrimination.

Copies of the Complaints and investigation documents, along with copies of notices to and responses from Feldman regarding the complaints, are attached as Composite Exhibit 1.

# INVESTIGATION

The undersigned investigated the interrelated issues set forth above, which are separated into three categories below.  As part of that investigation, the undersigned reviewed documents provided by the Complainant and the City.  The undersigned also interviewed twenty-nine (29) witnesses: Wilson; Feldman; Dan Hoffman ("Hoffman"); Fred Murry ("Murry"); Zanorfa Lynch ("Lynch"); Steve Varvel ("Varvel"); Donia Kirchman ("Kirchman"); Karen Fiore ("Fiore"); Pete Backhaus ("Backhaus"); Sarah Vidal-Finn ("Vidal-Finn"); Deborah Bowie ("Bowie"); Eileen Marzak ("Marzak"); Jessica Krauszer ("Krauszer"); Malisa McCreedy ("McCreedy"); Erik Bredfeldt ("Bredfeldt"); Andrew Persons ("Persons"); Phil Mann ("Mann"); Ed Gable ("Gable"); Lisa Jefferson ("Jefferson"); Thomas Harrington ("Harrington"); Audrey Gainey ("Gainey"); Gayle Dykeman ("Dykeman"); Roberta Griffith ("Griffith"); Anne Wolf ("Wolf"); Lisa Redmon ("Redmon"); Shelby Taylor ("Taylor"); Adrian Hayes-Santos ("Hayes-Santos"); Lauren Poe ("Poe"); and Colin Baenziger ("Baenziger").

The undersigned also consulted with the City's Equal Opportunity ("EO") Director, Teneeshia Marshall ("Marshall"), who began the initial investigation before it was turned over to the undersigned.  The undersigned reviewed interview notes from interviews conducted by Marshall, which include an interview with one witness, Veronica Davis ("Davis"), who the undersigned was not able to separately interview.  The undersigned also reviewed numerous documents pertaining to the allegations by the Complainant.

## I.  REORGANIZATION OF THE CITY

Wilson asserts that the reorganization of the City's departments and divisions implemented by the Respondent has a disproportionate adverse impact on the City's female employees.  A summary of the reorganization and its effect on the City's various departments and divisions is set forth below.

### A.  The Reorganization

Feldman joined the City as its City Manager in November of 2019.  Shortly thereafter, he began working to reorganize the City's departmental structure.  On January

23, 2020, Feldman issued his first memorandum to leadership staff making significant changes to the administrative organization to be effective on February 17, 2020. A copy of the memorandum ("Memo 1") is attached hereto as Exhibit 2.

On January 24, 2020, Feldman issued a follow-up memorandum to correct and clarify certain changes implemented under Memo 1. A copy of the second memorandum ("Memo 2") is attached hereto as Exhibit 3.

On May 1, 2020, Feldman issued a third memorandum to leadership staff to make additional changes to the organization. A copy of the third memorandum ("Memo 3") is attached hereto as Exhibit 4.

Memo 1 made extensive changes to the City's organizational structure, as summarized below.

### *(i)      Reporting Structure Changes*

Prior to the reorganization, the three Assistant City Managers ("ACMs") Murry, Bowie[3] and Hoffman; the Budget and Finance Director; the Human Resources Director; the Interim Department of Doing Director; the Strategic Initiatives Director; and the Chief of Police, reported directly to the City Manager.   Following the reorganization, the City Manager's direct reports are the three ACMs; the Chief of Police; the Chief of Fire and Rescue; the Director of Communications and Engagement; and the Director of Strategic Initiatives.

The ACMs were reassigned to oversee the following departments, divisions, and/or offices:

| | Memo 1 | Before Memo 1 |
|---|---|---|
| **Hoffman** | - Office of Community Investment Programs (OCIP)<br>- Transportation and Mobility (including Fleet)<br>- Public Works<br>- Sustainable Development (including Code Enforcement)<br>- Technology & Innovation | - Fire<br>- Parks and Recreation<br>- Transportation and Mobility<br>- Public Works<br>- Wild Spaces Public Places |

---

[3]      Before Respondent was hired, Bowie was the Executive Chief of Staff for the City.  Respondent subsequently changed Bowie's job title to Assistant City Manager.

| Murry | - Office of Intergovernmental Affairs & Grants<br>- Budget & Finance (including Liability & Insurance)<br>- Human Resources (including Benefits)<br>- | - Housing<br>- Code Enforcement<br>- Facility<br>- Fleet<br>- Special Project re: Homelessness |
|---|---|---|
| Bowie | - Office of Housing Services<br>- Parks, Recreation & Cultural Affairs (including Facilities Management)<br>- GCRA | - N/A (was acting as Interim City Manager for the year prior to Feldman's arrival) |

Additionally, the Code Enforcement Division was reassigned underneath the Department of Sustainable Development.

The Department of Doing was renamed the Department of Sustainable Development, and its economic development function was reassigned to the Gainesville Community Reinvestment Area ("CRA") Department.

### (ii)   *Classification Changes*

The Executive Chief of Staff, Bowie, was reclassified as an Assistant City Manager.  In addition, several departments were changed to divisions, and several divisions were changed to offices, as follows:

- The Department of Strategic Initiatives was changed from a department to an office under the City Manager, and its engagement function was reassigned to the Communications and Engagement Office.

- The Department of Communications and Engagement was changed from a department to an office under the City Manager.

- The Facilities Department was changed from a department to a division underneath the Department of Parks, Recreation and Cultural Affairs.

- The Fleet Management Department was changed to a division underneath Transportation and Mobility.

- The Risk Management Department was changed from a department to a division underneath the Finance Department, and its function was limited to

administering liability and insurance issues. Risk Management also administered employee benefits and workers' compensation, but those functions were moved to the Human Resources Department.

- Housing and Community Development was changed to an office.

- The Mobility Department was renamed the Transportation and Mobility Department.

- The Office of Intergovernmental Affairs and Grants was established.

- The Office of Community Investment Program (OCIP) was established.

Memo 2 was limited to reversing the proposed changes to the Risk Management Department made by Memo 1.  Specifically, Memo 2 altered the reorganization process so that the Workers' Compensation and Retirement Services remained within the Risk Management Division of the Finance Department.

Memo 3 made several additional changes to the City's organizational structure as well as additional classification changes.  First, Memo 3 moved the Facilities Division to the Public Works Department.  Additionally, the Wild Spaces and Public Places Program was reassigned to the Parks, Recreation and Cultural Affairs Department.

Next, the Office of Community Investment Programs ("OCIP") was renamed the Office of Capital Asset Planning and Economic Resilience ("CAPER").  The Land Rights Coordinator in the Public Works Department was reassigned to the CAPER office.  The City Architect was reassigned to the CAPER office and assigned to also work with the Department of Sustainable Development.

Finally, the Risk Management Division was reclassified as an office, renamed the Office of Risk Management, and reassigned to report to ACM Murry.

### B.    Summary of Changes Resulting from the Reorganization

Pursuant to the reorganization, three departments led by females (Strategic Initiatives, Communications, and Housing and Community Development) and three departments let by males (Facilities, Fleet Management, and Risk Management) were changed from a department to a division, or a division to an office.  Additionally, four female employees (Wolf, Betsy Waite, Kara Brecken, and Sarit Sela) and four male employees (Gable, Backhaus, Bredfeldt, and Varvel) were moved laterally or reassigned from one department/division to another.

Respondent reported working on the proposed reorganization with the ACMs for "a good 60 days" to determine what the organization structure should look like. Those conversations reportedly began within his first week after being hired. Respondent explained that, at prior jobs, he assigned ACMs to oversee separate functions, which he described as "operations" and "internal functions", and he wanted to continue with that process in Gainesville. He further reported his belief that the City had too many departments and he wanted to implement a traditional government operation.

Feldman stated that his reorganization placed most departments under the purview of the ACMs while other departments were collapsed into divisions or offices to change nomenclature and fit better within the structure. Feldman also explained that at every City where he was employed as City Manager, the police and fire departments reported directly to the City Manager because public safety is a primary function of local government.

Respondent explained his view that a department is led by an individual who can independently effectuate decisions subject to the review of ACMs or the City Manager. A division was described as an element of a department, with a division manager reporting to a department head. Finally, an office was described as a unit that provides overall support for the organization but does not necessarily effectuate policy. In Respondent's view, offices report to the City Manager or to an ACM.

Respondent could not recall whether he discussed the proposed reorganization with the City's department directors, but he believed that he may have had some such discussions. He did, however, recall speaking to the City's fire chief about being a direct report to the City Manager's office. Respondent separately reported his belief that he discussed the reorganization with "everybody" and that he briefed the City Commission before issuing Memo 1. Respondent did not believe that any City employees should have been surprised by the contents of Memo 1.

When discussing the reorganization and the assignment of departments to the ACMs, Respondent reported his belief that there was a misunderstanding as to the ACMs receiving an unbalanced number of departments. He recalled that someone told him he should divide the departments so that the ACMs were each responsible for the same number of employees. Respondent believes that is not appropriate and that the City should have an operational ACM, an internal ACM, and an equity ACM. Respondent described the equity ACM as having oversight over equity issues, housing and neighborhood development, and the CRA. Feldman said he discussed his proposed changes with the City's ACMs and stated that no concerns regarding the reorganization were raised. However, he did make some changes to his original plan to align duties based upon function and operation.

ACM Bowie reported concerns over the distribution of work amongst the ACMs, stating that the lion's share of work (based upon employee counts or department size) went first to ACM Hoffman, who is the least experienced ACM, and then to her, and lastly to ACM Murry.  She reported having conversations with the Respondent about this issue with the City's Director of Human Resources present, and said Feldman explained that he did not consider the distribution in terms of numbers, but rather the functions being performed. Jefferson prepared a report to underscore some of the concerns staff had; however, the report reflects that, based upon employee counts, ACM Hoffman supervised a larger number of employees than ACM Murry or ACM Bowie before the reorganization.  A copy of that report is attached as Exhibit 5.

## C.   Effect of Reorganization on Employees

Various City employees reported their belief that the changes made to their job titles, roles and position in the City were *de facto* demotions.  Communications Director Taylor reported her view that the reorganization of her department was a downgrade. Nevertheless, she also reported that she did not take "huge issue" with the change because no employees were transferred from her department, and the reorganization had no impact on her employees' titles or salaries.

Strategic Initiatives Director Griffith reported that she considered the change of her department to an office as carrying a negative connotation.   She claimed that departments have authority for budgets, and they have an insulated silo of responsibilities which are not present in an office.  She further stated her belief that a department is run by a director, which implies more authority than the head of an office, which is smaller than a department.  She indicated her belief that the change from a department to an office had a negative implication for her salary and responsibilities.  Griffith reported that she informed Respondent that she was disappointed by the "downgrade," and he responded that it was not a downgrade because the head of an office would speak as the voice of the City Manager.  Griffith said she told Feldman that every department speaks with the voice of the City Manager, but Feldman did not want to entertain the conversation.

Community Engagement Program Manager Wolf reported that she considered her reassignment from Strategic Initiatives to Communications to be a demotion because she moved from having a physical office to a shared workspace, which had a negative effect on her ability to be productive.  She further reported her understanding that moving out of the City Manager's office reduced the authority of her position.

Facilities Manager Gable reported that the reorganization did not have an effect on his operations but that he believed some people might consider the change from a department to an office to be a downgrade.

Economic Development and Innovation Director Bredfeldt reported that he does not necessarily consider the change from a department to an office as a demotion or to carry negative connotation. He reported his belief that it was too soon to make that judgment as to the effect of that change.

Respondent reported that he does not believe that moving from a department to a division would classify as a demotion because the unit's responsibilities and pay do not change.   Respondent similarly reported that the change from a department to an office is "clearly" not a demotion. He explained the purpose of the reorganization was to change names and reporting structures not to promote or demote employees.

### D.    Lack of Communication

Wilson also asserted that there was a lack of communication by the Respondent concerning the reorganization and related matters.

Wilson reported that Feldman failed to consult the City's charter officers and department heads about the reorganization and gave no consideration to salaries or Human Resources issues.  Respondent stated that he talked to Wilson about two changes before Memo 1 was distributed: (i) moving the Budget function of the Finance Department to the City Manager's office under ACM Murry; and (ii) moving a portion of the Risk Management division into the Finance Department. Feldman reported that Wilson expressed concern about moving Budget as she had a good working relationship with the Budget Manager and wanted to keep Budget within the Finance Department.  Respondent reported agreeing to that request but reserved the right to change his mind in the future. Wilson acknowledged that Feldman spoke to her about these issues on January 13, 2020. However, she stated that they did not discuss moving the Budget function to ACM Murry. Rather, Wilson understood from Budget Manager Fiore that Feldman intended Budget to report directly to him.  Respondent reported that the reassignment of the Risk Management Department took effect when Memo 1 was distributed.  However, based on feedback from ACM Murry, Respondent reported that he has since moved the Office of Risk Management under ACM Murry and it is no longer part of the Finance Department or the Human Resources Department.  Feldman also reported having general meetings with Wilson to discuss budgetary functions and the impact of the reorganization on those functions. Wilson reported having no recollection of any such meetings.

Wilson also reported that Respondent undermined her authority by creating a new grant program near the outset of the COVID pandemic without informing her, and that he assigned 60% of the functionality of that program to the Finance Department.  Wilson reported learning about the program from another department.  Feldman reported that he quickly assembled a grant program for the benefit of the City's business community and citizens.  He explained that he assembled a team, including the 3 ACMs, the CRA Director,

the CAPER Director, and Housing and Community Development Manager Richardson, and that the team designed the program. It was his expectation that if another department was involved, the ACM overseeing such department would communicate with that department. Feldman reported that he did not ask Wilson to be on the team because he tried to keep the program simple. He further explained that the Finance Department would primarily only be needed to issue checks and make necessary budget transfers. Wilson said she believed that Feldman set her up to fail as she was not informed of her responsibility for the new grant program.

Wilson said that she did not know whether Feldman acted in the same manner toward male employees, but stated it was probable that her issues may be a result of disagreement over management style.

Concerning Memo 2, Feldman reported consulting with 3 ACMs "at minimum." He further reported his belief that he discussed or had an ACM discuss Memo 2 with all employees that would be affected. As to Memo 3, Respondent reported consulting with 3 ACMs, but he did not recall whether he discussed Memo 3 with the City's department directors. Respondent reported his belief that he directed the ACMs to talk with directors that were involved.

ACM Bowie reported having an initial conversation with Feldman in December of 2019 about the reorganization. Feldman did not inform Bowie that her title would be changed from Executive Chief of Staff to Assistant City Manager. Instead, Bowie was informed of the change after she contacted the Human Resources Department. Bowie also reported that Feldman created a new division (OCIP/CAPER) and moved Economic Development and Innovation Director Bredfeldt to the head of that division. Bowie further reported that Feldman created positions in that division without the participation of the EO Department or the Human Resources Department. Bowie reported telling Feldman that a new division should not be created without consultation with the EO Department and that job descriptions must be written in compliance with each department's equity goals. Bowie further reported that she did not have any conversations with Feldman about forming OCIP/CAPER and she first saw it on the reorganization chart. Finally, Bowie reported that she does not know how OCIP/CAPER will intersect with the CRA, how it will be funded, and how it will be staffed.

Communications Director Taylor reported that Feldman told her she would be reporting directly to him but said he did not really consult with her about proposed changes even though she was assisting him with editing the reorganization memoranda. Taylor reported telling Feldman that she thought they should be careful about sending out Memo 1 because it would result in a number of questions from City employees and she believed Feldman should speak to the affected employees first. She reported that Feldman told her he had such conversations and he insinuated that those conversations were "robust."

However, Taylor subsequently spoke with Strategic Initiatives Director Griffith and Risk Management Director Varvel and they portrayed Feldman's conversations regarding the reorganization as "drop-ins" or quick chats.

Transportation and Mobility Director McCreedy reported discussing changes to the City's organization with ACM Hoffman in January, including that her department would absorb the Fleet and Facilities Departments. McCreedy reported that she volunteered to oversee the Fleet Department because she had relevant experience. However, McCreedy did not get confirmation about the changes from Feldman until the day before or the day that Memo 1 was issued, and it was an informal "two-minute" conversation with Feldman before another meeting. McCreedy said she believed that department leaders affected by the reorganization would have one-on-one meetings with Feldman. When no meeting was scheduled by Feldman, she requested a meeting, which took place on December 26, 2019. McCreedy reported talking to Feldman about the reorganization during that meeting but said she was not provided significant details or told what was expected. McCreedy stated that she has not had any other conversations with Feldman about the reorganization.

Strategic Initiatives Director Griffith reported that she learned about changes to her department, including that her department was being downgraded to an office, from Communications Director Taylor, who showed her a draft of Memo 1. Griffith said she asked how she should request more information about the reorganization but Feldman did not want to entertain questions individually. Taylor was directed to set up an email box and answer emailed questions with Feldman's input. Griffith reported that she repeatedly requested a meeting with Feldman and was not able to discuss Memo 1 with him until that meeting occurred. Griffith reported her impression that Feldman doesn't talk to the City's employees for counsel or guidance.

Human Resources Director Jefferson reported that Feldman generally mentioned a plan to send out communications regarding the reorganization during a January leadership team meeting. She reported that Feldman did not discuss the reorganization with her before distributing Memo 1. Jefferson further reported her belief that Feldman did not have meaningful conversations with her about the impact of the reorganization on the Human Resources Department. Jefferson also reported that she learned from Strategic Initiatives Director Griffith that Feldman was planning to transfer a Human Resources employee to a different department, which would have a significant impact on her department. Jefferson also explained that from a planning perspective, the Human Resources Department, the Finance/Budget Department, the EO Department, and the legal department should be involved in analyzing the proposed reorganization for any potential adverse impact. Jefferson reported having a "huge concern" about not having insight into the reorganization process in order to ensure resources were adequately allocated to implement desired changes.

CRA Director Vidal-Finn reported learning about the reorganization through Memo 1. She stated that she was surprised that her reporting structure had changed because she believed there was an ordinance that required her position to report directly to the City Manager.  She also reported learning from Memo 1 that the reorganization called for a new capital projects department.  Vidal-Finn said she was surprised to see this new department because her team had been responsible for capital projects and Feldman had not discussed changes to her department with her.

Community Engagement Program Manager Wolf reported that Feldman informally asked her if she would accept her position being moved from the Strategic Initiatives Department to the Communications Department.  Wolf explained that she did not believe her opinion about the move would matter and, thus, she told Feldman she agreed.

Budget Manager Fiore reported that Feldman showed her a draft organization chart and went through it with her.  She said Feldman told her that she would no longer report to Wilson because Budget was being moved to the City Manager's office.  Fiore explained that this plan changed after a subsequent conversation between Wilson and Feldman.  Fiore also said that Feldman instructed her not to discuss the proposed change with Wilson. Nevertheless, Fiore discussed the proposed change with Wilson shortly after that meeting. Feldman reported that his instruction to Fiore not to discuss the proposed change was due to the fact that he had not made a final decision as to whether to move Budget to the City Manager's office and sometimes he directs confidentiality because his ideas are "not for public consumption" unless and until they are "fully cooked."

Intergovernmental Affairs Coordinator Harrington reported that he attended a meeting with Feldman to discuss changes to his department.  He described the changes implemented as part of the reorganization as nomenclature changes with offices and departments and some moving around of ACM oversight of departments.  He reported that his meeting with Feldman lasted only a couple minutes and noted his impression that most meetings with Feldman did not last more than 2-5 minutes.

Facilities Manager Gable reported having a conversation with Feldman about the reorganization shortly before Memo 1 was issued to discuss moving his department to the Parks and Recreation Department.

Respondent reported talking to the fire chief about changes to reporting structure before Memo 1 went out.

Interim Department of Sustainable Development Director Persons reported that Feldman told him a week or two before Memo 1 was issued that Code Enforcement would likely be reassigned to his department.   He noted that his impression was that the

reorganization was a fairly fluid process and that potential changes to the City's organization were still under consideration.

Economic Development and Innovation Director Bredfeldt reported that Feldman contacted him in early January of 2020 to discuss the reorganization because he wanted to give him a courtesy notice and apprise him of the changes.  He reported that Feldman informed him that a new office was being created (OCIP/CAPER) and explained its function.  Bredfeldt said Feldman told him he was going to talk to Andrew Meeker ("Meeker"), a then-employee in the CRA Department, about being assigned to that office. Bredfeldt also reported his belief that Feldman intended to speak to all employees who were affected by the reorganization, but he was unaware of whether those discussions occurred.  Bredfeldt said subsequent changes to his function within the organization were not discussed with Feldman.

Risk Management Director Varvel reported talking to Feldman about moving Benefits away from Risk Management, and that he shared "business reasons" with Feldman as to why that change should not be made.  Varvel reported that Feldman stated he would consider Varvel's comments and would get back to him. Varvel said he did not discuss the proposed transfer with Feldman again.  Instead, when Memo 1 was distributed, Varvel saw that Benefits and Workers' Compensation had been moved to the Human Resources Department. Varvel did not discuss the transfer of Workers' Compensation with Feldman prior to receiving Memo 1.  Varvel said he reached out to Feldman after Memo 1 was issued to express his concerns and noted Feldman's failure to discuss all of the proposed changes with him.  Subsequently, Varvel reported that he was made aware that Benefits and Workers' Compensation were being reassigned back to Risk Management when he received Memo 2.

ACM Hoffman said Feldman signaled early on that he wanted to reorganize the City by telling all leadership team members during a meeting, but he did not report any specific conversations with Feldman about the reorganization.

Public Works Director Mann said he was not affected by the changes implemented by Memo 1.  Prior to the issuance of Memo 3, Feldman informed him that Facilities would be transferred to his department.  Feldman did not, however, inform Mann that the Land Rights Coordinator would be transferred to a different division, which Mann learned when he read Memo 3.  Mann does not consider any of the changes as a demotion.

Neighborhood Enhancement Manager (formerly Code Enforcement Manager) Backhaus reported that he had no conversations with Feldman regarding the reorganization, but he did speak to ACM Hoffman and possibly Interim Department of Sustainable Development Director Persons. Backhaus said Hoffman told him that Feldman

believed that the City could function better with a different reporting structure and mentioned that Feldman thought several areas Murry managed were "underperforming."

ACM Murry reported becoming aware of the reorganization in November 2019 and providing feedback to Feldman.  In or around early December 2019, Murry took a medical leave of absence and he did not have any further discussions with anyone about the reorganization until he returned in March of 2020.

## II.   <u>ALLEGATIONS OF UNDERMINING AUTHORITY</u>

Wilson also reported that the Respondent circumvented the authority of several female employees occupying leadership roles within the City, including her, by communicating directly with subordinates about changes to their departments and without consulting those leaders.

As noted above, Feldman contacted Budget Manager Fiore, who was a subordinate employee of Wilson, to discuss changes to her reporting structure.  Fiore reported that Feldman told her he was going to move Budget out of the Finance Department and that she would no longer be reporting to Wilson and would instead be reporting to him.  Fiore also stated that Feldman told her not to tell Wilson because the reorganization chart was still being "tweaked."  Wilson said that Feldman did not notify or consult with her about this proposed change before speaking to Fiore.  Feldman said he talked to Fiore before talking to Wilson to "just get a sense," explaining that he and Fiore were in a meeting and he was thinking about moving Budget to his office.  He said he did not talk to Wilson beforehand because he was just exploring concepts.  He does not recall whether he told Fiore not to tell Wilson, but if he did, it may have been because he was just thinking about it without making a decision.  He explained that sometimes he tells people information is not for public consumption if he wants to get feedback without pushing things out to the entire organization "before they are cooked."  He said after he talked to Wilson about the potential change, she made a good rational argument to keep Budget with Finance and he agreed. City Manager's Office Coordinator Lynch also reported that she observed Feldman circumvent Wilson and go to Fiore often.  Likewise, CRA Director Vidal-Finn stated that Feldman goes to Fiore because it seems he likes to find people that do not ask questions.

Feldman reported contacting then-CRA employee Meeker, who was a subordinate employee of CRA Director Vidal-Finn, about filling a newly created position in the CAPER office.  Vidal-Finn said Feldman did not notify or consult with her about this proposed change before speaking to Meeker.  Feldman said he did not consult with Vidal-Finn before talking with Meeker because of timing and because if Meeker was not interested, it would be moot.  Vidal-Finn learned about Feldman's offer when Meeker announced his new role during a CRA team meeting.  Vidal-Finn asked ACM Bowie if she was aware of the situation and whether Bowie knew Meeker's start date in the newly

created office. She was told that when Bowie raised the matter with Feldman, he denied that he offered Meeker a position. Vidal-Finn explained that Meeker is very smart and she believes that Feldman did tell Meeker he had the position. Jefferson reported telling Feldman that if he intended to move Meeker to a new department, it was creating performance problems (referring to insubordination by Meeker), and she recommended that Feldman talk directly to Vidal-Finn and Meeker. Vidal-Finn said that she believes the fact that Meeker was offered a new position gave him a sense of power and he then began exhibiting performance issues in the CRA which ultimately led to disciplinary action and, eventually, Meeker's resignation. Vidal-Finn said that she and the CRA department were adversely impacted as a result of Meeker being offered a new position by Feldman.

Feldman reported contacting Community Engagement Program Manager Wolf, a subordinate employee of Strategic Initiatives Director Griffith, about moving Wolf's position to the Office of Communications and Engagement. Feldman did not notify or consult with Griffith about this proposed change before speaking to Wolf. Wolf said Feldman stopped by to talk to her about moving her position to the Office of Communications and Engagement before Memo 1 was issued. Wolf also stated that Feldman would stop by and ask her and her office mate to do small tasks, which presented a challenge because direction was not coming through Griffith. Wolf also said the Office of Communications and Engagement did not seem ready for her arrival, and Communications Director Taylor seemed surprised about the transfer. However, Taylor said Feldman told her many times that he wanted Wolf to be moved to her unit, well before Memo 1 came out. Griffith reported that Wolf had side conversations with Feldman often, and that Feldman did not talk to her about moving Wolf's position, which she thought was inappropriate. She learned about Wolf's position being moved through gossip and then through reviewing Feldman's proposed reorganization memoranda and talking with Taylor. Feldman stated that he did not remember whether he spoke with Griffith about potentially moving Wolf to Communications before he talked to Wolf.

Economic Development and Innovation Director Bredfeldt said Feldman contacted him about being moved to the newly created OCIP (and later CAPER) office. At the time, Bredfeldt was subordinate employee of Interim Department of Sustainable Development Director Persons. Bredfeldt said he did not know whether Feldman spoke to Persons before speaking to him. Persons said he does not recall that Feldman spoke to him before speaking to Bredfeldt. Feldman stated that he does not remember whether he spoke to Persons but that chances are likely that he did not. Feldman explained that this was an example where there was a department of one person housed within another department, which did not make sense to him. Feldman did not view Persons as the logical "head" over Bredfeldt who would need to be consulted about moving Bredfeldt. City Manager's Office Coordinator Lynch said she overheard a conversation wherein Feldman offered Bredfeldt a new position to lead OCIP/CAPER. ACM Hoffman said Feldman told Bredfeldt that he

could not be a "one man show" and that he needed to leverage other people from other departments.

Public Works Director Mann said that Feldman did not tell him he was transferring one of his subordinate employees, Land Rights Coordinator Karen Brecken ("Brecken"). However, Feldman also did not discuss the move with Brecken.  Mann first learned the information from reading Memo 1, and Brecken learned about her transfer from Mann.

Senior Executive Assistant Krauszer, who reports to City Manager's Office Coordinator Lynch, said Feldman will sometimes go to her without consulting Lynch if Lynch is not available and Feldman has an urgent need.  She described his requests as matters related to minor tasks.

City Manager's Office Coordinator Lynch reported Feldman went to then-Assistant Human Resources Director, Veronica Davis ("Davis"), to initiate the process to fill the Finance Director position permanently without first consulting with Human Resources Director Jefferson.

Human Resources Director Jefferson said that Feldman wanted to move one of her employees from the Human Resources Department to the Office of Strategic Initiatives, which she learned from Strategic Initiatives Director Griffith, but ultimately, Feldman changed his mind.

CRA Director Vidal-Finn reported observing Feldman circumventing the Fire Chief and Deputy Fire Chief to go to another employee, Captain Jamie Kurnick ("Kurnick"), who is very accommodating and easy to work with.  Feldman explained that he spoke with Captain Kurnick about a position she was applying for in another community, career goals, and philosophies of community policing.  Feldman reported that he has an open-door policy and will always be willing to talk about those types of issues.

Public Works Director Mann reported an example of his expectations that a person in leadership would consult with him before talking with his subordinates.  Specifically, he stated that ACM Hoffman recently asked him if he could use his new engineer on the hiring panel for the Department of Sustainable Development Director position before reaching out to the engineer.  Mann said he wants the consideration and respect to talk to one of his employees.

In response to the claim that he circumvented the authority of City employees, Feldman stated that the ability to talk to people is a primary function of a chief executive officer.  He stated that he does not need clearance to talk to individuals employed by the City and explained that sometimes talking to people is just timing when you are thinking through items and looking at talent. ACM Hoffman also explained that Feldman; the prior

City Manager Anthony Lyons; and Bowie (while acting as interim City Manager) all spoke with subordinates all the time.  ACM Hoffman said he will occasionally ask Feldman to copy him in the future when he is not consulted, and that Feldman has apologized.

## III.  <u>HIRING A PERMANENT FINANCE DIRECTOR</u>

### A.  <u>Hiring Process for the Finance Director</u>

Prior to November of 2018, Wilson was employed by the City as Assistant Finance Director.  In November of 2018, the Finance Director position became vacant and Wilson became the Interim Finance Director.  At that time, Bowie (as Interim City Manager) elected not to hire a permanent Finance Director, deferring that decision until a new City Manager was selected.

The City's process for filling a vacant director position is usually led by the person to whom the director would report.  That individual is assigned as the hiring manager to facilitate the hiring process. In the case of the position of Finance Director, that individual would report to ACM Murry.  However, Murry was out on medical leave from early December 2019 until the early February 2020, and Feldman initiated the process of hiring a permanent Finance Director.  Feldman decided that the permanent Finance Director position would be competitively posted. He reported his belief that he communicated that decision to Wilson in or around December 2019, and she responded that she would apply.

Feldman explained that he wanted to competitively post the Finance Director position because he was unsure whether Wilson had all the qualities he was looking for, and he wanted to see what other candidates might apply.  Feldman said he thought Wilson was a little too defensive of "the system" and that she did not demonstrate a desire to change processes and procedures to be more in line with current local government practices.  He said Wilson was knowledgeable and competent and was solution oriented on certain occasions.  He confirmed that Wilson was knowledgeable about the historic context for a lot of decisions and had some leadership and management experience.  Feldman said he has not had any disagreements or issues with Wilson.

The City engaged an executive search firm, Colin Baenziger & Associates ("Baenziger's Firm"), to advertise the position of Finance Director.  Interim Talent Acquisitions Manager Redmon said that executive search firms are often used for higher level positions (director or above), and sometimes used for technology positions or other positions that require very detailed experience.  Human Resources Director Jefferson said the standard was to post positions internally and/or externally but that executive search firms were typically used for leadership positions or positions that are difficult to fill, and confirmed that the City had previously used an executive search firm to fill the Finance Director position. She also said the Human Resources Department would make

recommendations as to potential hires, but the decision ultimately lies with the hiring manager. Budget Manager Fiore said executive search firms are usually just for higher level positions and noted there have been headhunters used for several positions recently. Risk Management Director Varvel confirmed that the City previously used an executive search firm for the Finance Director position, as well as other positions.

By contrast, City Manager's Office Coordinator Lynch said it was not common to use an outside recruiter for a department head position, and typically that was reserved for charter officers. ACM Bowie reported that search firms are typically only engaged for the executive team, and she did not know why an executive search firm was used for the Finance Director position. Then-Assistant Human Resources Director Davis said that, in her experience, an executive search firm would not be used for this type of position although she has seen them used sometimes. ACM Murry said the first time he ever used an executive search firm was for this Finance Director search. CRA Director Vidal-Finn said she has never in ten years seen a recruiter used "in her shop," but confirmed that the former City Manager used recruiters for non-traditional positions.

It is unclear who at the City made the decision to use an executive search firm and who decided to specifically engage Baenziger's Firm. Feldman denies having made the decision to use an executive search firm and said he let the Human Resources Department make that decision although he may have suggested the use of an outside recruiter because that is his personal preference. Feldman also denies that he made the decision to specifically use the Baenziger Firm. An email dated November 5, 2019 from Human Resources Director Jefferson to then-Assistant Human Resources Director Davis suggests that ACM Bowie asked the Human Resources Department to begin the hiring process for the Finance Director and Department of Doing Director positions. A copy of the email is attached as Exhibit 6. In that email, Jefferson stated that "Lee would like to advertise the [Department of Doing director position] for one week internally and externally (managed by [the City's] Talent Acquisition dept) and use a search firm Colin Baenziger for the Finance Director search." In her interview, Jefferson initially stated that Feldman directed the use of an executive search firm, but then she later said she could not point to a specific person who made the decision and commented that typically the Human Resources Department would engage search firms. However, Jefferson reported that Feldman specifically selected the Baenziger Firm. Bowie said she asked the Human Resources Department why they were using an executive search firm for the Finance Director position and not the Department of Doing Director position and was told that Feldman made the decision. In contrast, Davis said she and Jefferson made the decision to use Baenziger's Firm. Feldman reported that the Human Resources Department has recommended not using an executive search firm to fill other positions, and he accepted that recommendation.

Baenziger's Firm was the executive search firm utilized by the City to fill the City Manager position for which Feldman was selected. Procurement Specialist Dykeman

confirmed that Baenziger's Firm was part of a qualified pool of five executive search firms the City could utilize without having to issue a request for proposal each time they needed to fill a position.   Human Resources Director Jefferson, ACM Bowie, Risk Management Director Varvel and City Manager's Office Coordinator Lynch said that the City Commission was not satisfied with the quality of Baenziger's services, and they were surprised that Baenziger's Firm was selected to perform an executive search for the Finance Director position.  Jefferson said she provided this feedback to Feldman before Baenziger's Firm was engaged, but Feldman still opted to use the firm.  Wilson reported that Baenziger was very unprofessional and offered one example that he would forward emails with candidates' names and other information that should have been kept confidential.  Wilson also reported that Baenziger also called her and abruptly asked "what kind of manager are you?" Finally, Wilson reported that Baenziger's Firm missed a scheduled a call, and only asked her generic questions about her strengths and weaknesses.

It was reported that Feldman and Baenziger had a friendship.  Baenziger reported having met Feldman somewhere between 1998 and 2000.  Baenziger acknowledged that he called Feldman about this investigation when he was contacted by the undersigned to set up his interview, and that Feldman told him allegations of gender discrimination had been made against him.  Baenziger reported that Feldman did not provide details and told him to tell the truth.  Baenziger described his relationship with Feldman as business oriented for the most part.  He explained that he thinks Feldman's reading taste is eclectic, so they have discussed books.  He reports they have also discussed their families. Baenziger also reported having discussions with Feldman about the City and that he has discussed with Feldman that information does not flow well up and down the chain of command, with things taking longer than they should.  Feldman reported talking to Baenziger periodically over the last decade or two but said they do not go to dinner or socialize.  Feldman explained that Baenziger is a recruiter who does a lot of Florida searches and he has always picked Baenziger's brain as to what candidates are out there.

Baenziger's Firm was retained around January of 2020 to locate candidates for the Finance Director position.  Baenziger said Feldman called him "pretty early on" and told him what he was looking for in a Finance Director.  Baenziger also asked then-Assistant Human Resources Director Davis which City employees he should speak to about the role of the Finance Director.  Davis reported that Human Resources Director Jefferson gave her the names of three people Baenziger could consult with about the position, including Wilson.  A copy of the related email chain between Davis and Baenziger is attached as Exhibit 7.

On January 10, 2020, Davis notified Wilson via email that she offered Wilson's name as a resource to Baenziger's Firm, and Wilson replied that she believed it was inappropriate for her to provide input on the position because she intended to apply.  A copy of the email chain is attached as Exhibit 8.   Additionally, Baenziger emailed Wilson saying he would

like to speak with her because he is "helping the City find her replacement as Finance Director." A copy of that email is attached as Exhibit 9. Wilson was upset by the emails and expressed her concerns to ACM Bowie, who apologized and said she did not know what was going on. In the same email chain between Davis, Wilson, and Bowie, Davis wrote that it was Jefferson who suggested she recommend Wilson and two other employees to Baenziger as informational resources for his project needs assessment. *See* Exhibit 8.

When Feldman learned from ACM Bowie that Baenziger had contacted Wilson and that she was upset, he called Baenziger to address the situation. Baenziger reported telling Feldman he had Wilson confused with the interim Auditor who had come back to the City from retirement. Baenziger stated that Feldman told him that Wilson was applying for the position and that she was doing a pretty good job. Feldman confirmed that Baenziger told him he had gotten Wilson confused with the City Auditor. Feldman said he told Baenziger that the situation needed to be fixed; that Wilson should apply and be given the utmost consideration and opportunity; and that he had no issues with Wilson competing for the position.

Additionally, Human Resources Director Jefferson directed Interim Talent Acquisitions Manager Redmon to contact Baenziger about the email and Baenziger told Redmon that he had confused Wilson with the former City Auditor. Interim Assistant City Auditor Marzak is the employee to whom Baenziger was referring, but Marzak said she has never spoken to Baenziger. Wilson reported Feldman made numerous attempts to contact her after learning about Baenziger's email, calling her nine times and sending her two text messages on the weekend of January 11 and 12, 2020. Wilson reported that she was not comfortable having a conversation with Feldman about Baenziger's email without someone else present. Wilson emailed Feldman on Monday, January 13, 2020, to express her discomfort with discussing the subject. Feldman responded that Wilson was not being "replaced," and that he spent time to understand where the issue came from and wanted to discuss it. A copy of this email exchange is attached as Exhibit 10.

Wilson also reported concerns about the advertisement for the Finance Director position, which incorrectly stated that candidates must be a CPA. Wilson and Budget Manager Fiore reported that Feldman had indicated that he believed the Finance Director should be a CPA; that Feldman was advised it was not a job requirement for the Finance Director; and that Feldman said that the assistant Finance Director could be a CPA if the Finance Director was not. Wilson and Fiore both noted a CPA was not a requirement for either position. Then-Assistant Human Resources Director Davis acknowledged that the advertisement incorrectly stated that a CPA was required instead of being preferred. The advertisement was reviewed by Davis, Human Resources Director Jefferson and the ACMs prior to being posted. Feldman reported that he looked at the brochure, but he is not sure who prepared it. He believes he had two comments, including a question about the salary range and the other about an ambiguity in the advertisement as to whether a CPA license

was required.  Feldman reported his belief that he provided his comments to ACM Murry; that the salary issue was resolved; and that he does not remember how the CPA issue was resolved.  Feldman reported his recollection that he was only presented with the brochure once for review.

Human Resources Manager Jefferson reported that Feldman changed the usual job description to include a CPA as a requirement.  She explained that she knew a CPA was not part of the City's job description and that Wilson did not have a CPA, so if Feldman was going to change that requirement through the posting, it needed to go through the appropriate process to change the job description and they should inform Wilson of the change. Jefferson discussed her concerns with ACM Murry and believes he spoke to Feldman, which resulted in the advertisement being changed to reflect the existing job description that a CPA was preferred but not required.  Feldman reported recalling some discussion as to whether a CPA was preferred or required, and his opinion is that a CPA is a preference but not required.  Baenziger did not recall any issues with the job posting and said that Feldman told him a CPA was preferred but not required.  Baenziger stated that if the job posting listed a CPA as a requirement, it was a mistake.  Jefferson and Interim Assistant City Auditor Marzak noted that the advertisement also included inappropriate language about the former City Auditor, which was ultimately changed.  Feldman reported that he has no information about this reference.  Marzak explained that the advertisement also included remarks about financial statements that were issued late in the previous year, which could be considered disparaging towards Wilson.  Murry reported that after he reviewed the advertisement, he told Feldman he would have removed certain things, like requiring a CPA, the reasons they were hiring, and one or two other things.

Wilson also reported that the advertisement for the Finance Director position was improperly posted on external websites (including NFBPA, the Local Government Hispanic Network, the National War College, and the Government Finance Officers Association) before being posted internally at the City.  Wilson explained that those websites are not places she would be likely to locate a job posting.  Human Resources Director Jefferson reported that the typical process was for the City to post advertisements internally with a link to a recruiter's website.  She explained that because there was turnover in her department, there was a delay between the time Baenziger's firm posted the position via his resources and the time the City linked the advertisement to its website. Then-Assistant Human Resources Director Davis reported that the City was delayed in posting the advertisement internally because they were making changes, and she was not sure if they coordinated the timing of their posting with Baenziger's posting.

Wilson stated that during her application process, she asked to provide references but was told that references were unnecessary for her.  Baenziger reported that his procedures did not include checking references for internal candidates because the hiring entity would be familiar with its own employees, and because it would be awkward for the references

because they would be working with that person again whether they get the job or not, and everything in Florida is a public record.  As a result, Wilson's references were not consulted as part of the interview process while references for other candidates were contacted. Feldman reported that he does not recall personally contacting any references for any candidates but said he received a call from the City Manager for the City of Tamarac, who asked him to "give [one of the candidates] a good look."  Feldman did not recall the name of that candidate but believed he was one of the top three finalists for the position.  Feldman said he was not asked to check any references for any candidates, and he would not normally contact references.  Bowie stated that Feldman told her that he had spoken to Ramos's City Manager in Fort Lauderdale and received positive feedback.  She reported that Feldman told her he was leaning towards selecting Ramos and she thought it was odd. Bowie said this conversation took place before the second round of interviews.

Upon his return from medical leave, ACM Murry assumed the role of hiring manager for the Finance Director position.  He selected ACM Hoffman, ACM Bowie, Claudia Rasnick from Gainesville Regional Utilities ("Rasnick"), and Tommy Crosby from Alachua County ("Crosby") as interview panelists to interview six candidates for the Finance Director position.  Rasnick and Crosby are not City employees but have familiarity with finance matters.  As part of the interview process, panelists asked the same questions of each candidate and "scored" their answers using the following scale: Unacceptable, Marginal, Acceptable, Good, and Superior.  After the first round of interviews, three candidates were selected for a second round of interviews: Wilson; Cyntia Ramos ("Ramos"); and Mark Mason ("Mason").  Baenziger reported his impression was that the interview panel was not particularly impressed with Wilson because there was not a lot of discussion about her "blowing them away."  Baenziger also admitted the alternative that there were no conversations that Wilson did not "blow them away."

Following the second round of interviews, ACM Murry tallied up the "scores" and determined the candidates were ranked from first to third as Ramos, Wilson, and Mason. The difference in "scores" between Ramos and Wilson was very small. The undersigned assigned a numeric value to the scoring system used by the City and determined that the total score difference between Ramos and Wilson after two interviews was one point (328 vs. 329 points).  More specifically, the undersigned assigned 1 point for "Unacceptable," 2 points for "Marginal," 3 points for "Acceptable," 4 points for "Good," and 5 points for "Superior."  When a panelist scored a candidate midway, half points were used.

ACM Bowie reported that ACM Murry contacted her after reviewing the tally sheets to let her know that Ramos scored the highest.  She said Murry told her that he did not think Ramos performed as well during the second interview and he thought she did not have as much experience.  Bowie also said Murry told her that he thought Ramos was very bright but on a more junior level.  Bowie and Murry discussed that Wilson has been with the City for more than twenty years, that the City was participating in a state audit, and that

they were dealing with the COVID pandemic. Bowie reported that these, among others, were ancillary reasons to select Wilson for the position, which she discussed with Murry. Bowie reported that Murry agreed with her assessment and thanked her for her feedback. Bowie further reported that Murry was told by Feldman that he wanted to see more creativity from Wilson and that Wilson needs to think outside the box.

Ultimately, although the scoring system ranked Ramos slightly higher than Wilson, ACM Murry recommended hiring Wilson to Feldman.   Murry reported that recommendation was based on Wilson's intangibles, which he described as the number of projects underway and the fact that a new person takes time to get adjusted.   Specifically, he noted Wilson was working on the ERP process, a state audit, the proposed budget, a pension administration hearing, and a COVID FEMA application.  He reported his belief that he made his recommendation to Feldman on a Wednesday and that Feldman responded two days later stating he wanted to hire Ramos.  Murry reported that Feldman did not explain that decision to him.

Human Resources Director Jefferson reported that ACM Murry told her Feldman wanted to hire someone innovative and she suggested that if Murry felt strongly about Wilson, he should talk more with Feldman, noting that they needed to be able to defend their hiring decision.  Jefferson said Murry told Feldman he preferred to hire Wilson over Ramos and suggested that they offer Wilson the position but put her on probation. However, Feldman directed Murry to offer the position to Ramos.

Feldman confirmed that he attended brief 15-minute interviews with the final three candidates to see who they were.  He said he asked all three candidates the same questions in the same order.  Wilson reported that her meeting with Feldman was ten minutes long and that Feldman commented "I know you," which Wilson did not agree with because Feldman was new to the City.  She said they discussed what she was reading, what she does in her spare time, and why she wanted the job.  Wilson noted they asked her one good question about how she handled a sensitive situation at work, and she provided an example of a recent situation.

Feldman explained that he saw no reason to switch the rankings of the three candidates based on his limited interaction.  However, he admitted he did not know how the rankings were assembled or what they were based on.  He also said after he reviewed the candidates on paper, he told ACM Bowie that Ramos seemed like a strong candidate based on her professional history, education, and experience, but he could not remember any specifics at the time of his interview.  Bowie stated that Feldman told her that he had spoken to Ramos's City Manager in Fort Lauderdale and received positive feedback.  She reported that Feldman told her he was leaning towards selecting Ramos and she thought it was odd.  Bowie said this conversation took place before the second round of interviews.

Baenziger stated that Feldman called him after the interviews were completed to advise him who he intended to hire and said the official decision would come through other channels. Baenziger reported that a few days later, Interim Talent Acquisition Manager Redmon or ACM Murry notified him the City would be offering Ramos the position. Baenziger reported that he was not surprised when Feldman selected Ramos because Feldman likes creative people, a diverse team, and people who want to help change an organization to make it more responsive. Baenziger said he preferred Ramos over Wilson because of the degree of her experience, explaining that she had moved up some organizations very quickly, had worked in large government, and was highly regarded and active.

Feldman stated that he would have directed ACM Murry to hire Wilson if she had the highest score. He further stated that if the City had been unable to reach an agreement with Ramos, Wilson would be offered the position. City Commissioner Hayes-Santos reported that Feldman told him the same thing. Human Resources Director Jefferson recalled Feldman telling her around the time Baenziger erroneously emailed Wilson about "replacing" her that Wilson was a viable candidate and, barring someone with great experience and a CPA or someone essentially "walking on the moon," Wilson would likely be the person selected. ACM Bowie reported that the hiring manager has discretion to consider an interim candidate for the permanent position if another candidate is not "light years ahead" because there is a commitment by the City to develop its employees and for them to advance into higher positions. She also noted that "there is always somebody better out there."

Ultimately, negotiations with Ramos were successful and Feldman directed Communications Director Taylor to issue an internal announcement to City employees that Ramos was hired as the new Finance Director. Taylor reported that Feldman wanted her to issue the announcement urgently, which she thought was unusual because Ramos's start date was not imminent. Taylor reported that Feldman told her he did not want the information to be released in the newspaper where Ramos was from, which might cause someone to accuse Gainesville of not being forthcoming.

The Finance Director position requires a bachelor's degree in business or public administration, accounting, public finance, or related field, and eight years of progressively responsible management and supervisory experience in accounting and financial management for a governmental agency or other large entity. A certified government finance officer (CGFO) or certified public accountant (CPA) is desirable. A copy of the City's job description for Finance Director is attached as Exhibit 11. Wilson is a CGFO but not a CPA. She explained that as Assistant Finance Director, she oversaw budget, accounting, procurement, payroll (utility and general), accounts payable, accounts receivable (billing and collections), and supervised 42 people. While acting as interim Finance Director, Wilson functioned without an assistant director. She has been employed

with City since 2002, and since 2008 she has been in a manager position or higher. She started on the utility side and moved over to general government in November 2016. On the utility side, she oversaw rates, budget, and finance, and also navigated the Chief Financial Officer, Finance Director, and General Manager of Utilities all leaving at once. She also acted in the position of Interim Finance Director for a year and a half, has managed a lot of transition (the entire accounting department was re-staffed during an audit), has been working on an ERP project (new software system), and manages pension and investments for 1,500 employees. Copies of Wilson's resume and background documents provided by Baenziger's Firm concerning Wilson's qualifications are attached as Exhibit 12.

ACM Bowie said that during early conversations about the reorganization, Feldman asked the group about their opinion of Wilson. Bowie reported telling Feldman that Wilson is competent but there are some areas that could be improved, which is true for everyone. She was aware Wilson stepped into a "messy" situation as Interim Finance Director and had some challenges. Bowie personally believes that Wilson is qualified for the Finance Director position. CRA Director Vidal-Finn reported that Wilson has "really good experience" and is very collaborative. She said Wilson has experience with both utility and general government and that she is a very fine director. ACM Murry reported having some concerns, but that Wilson was doing a fairly good job. He feels Wilson is a good person but has weaknesses as a manager and suggested that she could be more aggressive. He also pointed out that during her interview, Wilson indicated some technical areas where she did not have expertise and was dependent upon staff. Murry commented that he does not score anyone highly, but he nevertheless recommended hiring Wilson instead of Ramos. ACM Hoffman stated he scored Ramos only slightly above Wilson, noting that Wilson was well prepared and did better during the second interview.

Ramos has a bachelor's degree in economics, with a concentration in operations and information management, as well as a master's degree in business administration. She also has the required eight years of progressively responsible management and supervisory experience in accounting and financial management for a governmental agency. Ms. Ramos is not a GCFO or CPA. Copies of Ms. Ramos's resume and background documents provided by Baenziger's Firm concerning Ms. Ramos's qualifications are attached as Exhibit 13.

Human Resources Director Jefferson, ACM Bowie and Wilson stated that it is typically the hiring manager's decision as to which candidate is offered the position. Jefferson and Bowie stated that it would be unusual for a City Manager to override a hiring manager's decision. Bowie provided an example of an occasion when she was acting as hiring manager and ignored the desires of the then-acting City Manager to fill a position for the Director of Communications, noting it is not common for a City Manager to "reach down." ACM Murry reported that he had been a hiring manager more than ten times during

his tenure with the City, and this Finance Director search was the only time he consulted with the City Manager.  Murry reported Feldman wanted to be involved and that the ultimate decision was to be made by Feldman.  City Commissioner Hayes-Santos and ACM Hoffman stated that it would be appropriate for the City Manager to be involved in hiring directors.  Feldman stated he did not care what prior City Managers did because he is his own manager with his own style, and he has always been involved in hiring for these types of positions.

ACM Bowie reported her belief that because of the active EO investigations and allegations of disparate treatment in the way the Finance Director position was advertised, Feldman should not be involved "at all."  Feldman reported that because Wilson filed a complaint, he wanted to make sure there was no potential for retaliation, and he took a hands-off approach to filling the Finance Director position.  He reported that he would typically be more involved in having a final say for this position if there had not been a complaint filed against him.

## B.  Hiring Process for the Director of the Department of Doing/Department of Sustainable Development

The Complainant alleged that the Respondent provided preferential treatment in the hiring process for a permanent director for the Department of Doing/Department of Sustainable Development ("DoSD") to a male employee, Persons, who was similarly situated to her.  Persons began acting as interim Director of the DoSD around the same time Wilson began acting as interim Finance Director.  Feldman reported that around December of 2019, he decided to direct-hire Persons as the permanent Director of the DoSD instead of using a competitive process similar to the process utilized for the permanent Finance Director position.  Feldman reported communicating that information to Human Resources Director Jefferson and the ACMs.

Feldman reported wanting Interim Department of Sustainable Development Director Persons to be the permanent DoSD Director because Persons thought outside normal paradigms; he seemed solution oriented; he was knowledgeable and competent concerning the land development code; he was familiar with particular individuals within the City; he was knowledgeable concerning the historic context for a lot of decisions; and had leadership management experience.

ACM Murry reported that the City has not made direct hires during his tenure and usually positions are competitively posted with the internal HR team.  Human Resources Director Jefferson explained that direct hiring may be appropriate in some circumstances.  Specifically, if there is a business reason to direct-hire a position, a department can present its case in writing, vet the issue with the appropriate charter officer, and then consult with the EO department.  Jefferson reported that she told Feldman that because there were two

director positions open, if he was going to direct-hire Interim Department of Sustainable Development Director Persons for the Director position, he should consider doing the same for the Finance Director position. Fiore said she has never seen a direct hire for upper level positions but said it would not be impossible if the policy is broadly applied to create an even playing field. CRA Director Vidal-Finn opined that there should always be competition because you never know who is interested in a position.

Interim Department of Sustainable Development Director Persons reported that about a month or two after Feldman arrived, Feldman told him that he was doing a good job, felt he was the right person for the permanent position, and said he would explore doing a direct hire. He explained that they had a follow up conversation after Feldman learned how Human Resources policies work, and Feldman told him the position would have to be competitively posted. City Manager's Office Coordinator Lynch said she overheard a conversation between Feldman and Persons wherein Feldman implied to Persons that he should not worry, and that the job would still be his. Persons does not recall Feldman saying anything to this effect, and Feldman denied making any such comments.

Feldman explained that he expressed his desire to direct-hire Interim Department of Sustainable Development Director Persons to Human Resources Director Jefferson and the ACMs but none of them provided negative feedback. ACM Bowie confirmed that although "everyone was caught off guard" by Feldman's desire to direct hire Persons, no one said anything to Feldman at the time. She said she suggested to Jefferson that she assist Feldman with filling the position. Feldman said that after he heard rumblings and "water cooler talk" that direct hiring was discouraged, he decided that the DoSD Director position would need to be competitively posted and he told Persons that he would need to compete for the position.[4]

Human Resources Director Jefferson reported her belief that Feldman made the decision not to use an executive search firm for the DoSD Director position. Then-Assistant Human Resources Director Davis said the Human Resources Department had some discussion about whether the City could handle the expense of another executive search firm, and said she thought that they could manage the recruitment internally. ACM Bowie reported the decision not to use an executive search firm for the DoSD Director position was made by Feldman but that she does not know why that decision was made. ACM Hoffman, who is the hiring manager for the DoSD Director position, reported that he did not have any conversations with Feldman about using an executive search firm for the DoSD Director position. Hoffman explained that he is always hesitant to use executive

---

[4] Meeker and Bredfeldt were also offered newly created positions by Feldman without having to engage in a competitive process. Feldman reported that he did not consider these to be direct hires. Instead, he considered them lateral moves as there was no increase in compensation or work type.

search firms because of the significant cost.  Hoffman also reported that Feldman has been entirely hands off concerning the permanent DoSD Director position.

The DoSD Director position requires a bachelor's degree, and a minimum of ten years of progressively responsible experience in public, private or non-profit organizations in business development, planning & zoning, community development or a related area, which includes three (3) or more years of supervisory or management experience. A master's degree is preferred and may substitute for the required experience on a year-to-year basis.  Additional knowledge of cutting-edge practices, technological platforms, software and programs that support business development, planning and zoning and community development functions (such as electronic plans review/submittal and interactive GIS mapping features) is highly desired.  A copy of the City's job description for DoSD Director is attached as Exhibit 14.

Wilson reported that she did not think Interim Department of Sustainable Development Director Persons had the requisite amount of experience but said she does not know how the City defines management experience. Feldman reported that he considers management experience requires that someone supervises people and has a management role.  When asked whether the amount of people being supervised is relevant to experience level, Feldman explained that it might make a difference, but it depends upon the job.  Pursuant to Persons's resume, he has more than three (3) years of experience managing employees. Copies of documents indicating Persons's qualifications are attached as Composite Exhibit 15.

Feldman reported that he has not spoken to anyone at the City about the job descriptions for either the DoSD Director position or the Finance Director position, and he has no opinion about the definition of supervisory or management experience as it specifically relates to the job descriptions.  Feldman reported that he did not read the job description for the DoSD Director position but that his understanding of the job is based upon his experience.  He stated that he did not know the number of years of management experience required for the position but explained that most job descriptions include the term "or equivalent," which he believes gives latitude for hiring.

Feldman also reported that he did not review the job description for the Finance Director position but that he knows the job of a Finance Director based on his experience.  He does not know the number of years of management experience required for the position.

Feldman reported that he saw a chart of all scores reflecting that Ramos was ranked first; Wilson was ranked second, and there was another gentleman ranked third.  Feldman stated that he does not remember the specific categories on which the candidates were scored and ranked, and he does not recall if he knew the basis of the scores at the time he reviewed the chart of scores.  He stated that he thinks he visually reviewed all categories,

but he was concentrating on the total sum. Feldman also reported that he does not recall that actual scores of each candidate or how far apart the scores were between candidates, but he explained that even a small half point would not have made a difference in his decision.  Feldman reported that he does not believe he discussed each category and score with ACM Murry but he may have.  He does not believe he discussed each candidate's ability to meet the job description with Murry.

By all accounts, Interim Department of Sustainable Development Director Persons is well-liked and has been an excellent interim Director of the DoSD.  Wilson described Persons as "an awesome employee."  City Commissioner Hayes-Santos said he had a conversation with Feldman before the DoSD Director position was posted that Persons was doing a great job and feedback from the community was that Persons was well-liked from both residents and the development community, which is a rare thing.  ACM Bowie said Feldman verbalized that he really liked Persons.  She also confirmed that she personally believes that Persons is qualified for the position and that the City Commission really liked Persons.

### C.  <u>Timing of Hiring Processes</u>

ACM Bowie told Feldman she did not think it was appropriate to rush filling the permanent Finance Director position because of this pending investigation; because the Finance Department was in the middle of critical processes; because Wilson had stability and had rebuilt the Finance team, and because of difficulties and inconveniences caused by the COVID pandemic.  By contrast, the hiring process for the DoSD Director position has proceeded slower than filling the Finance Director position. ACM Hoffman, who is the hiring manager for the DoSD Director position, said he was too busy to move the process faster.  However, Hoffman was able to participate as a member of the hiring manager panel for the vacant Finance Director position.

Feldman stated neither position was more urgent to fill than the other, and he does not know why the Finance Director position was posted first.  Baenziger said he did not observe an urgency to fill the Finance Director position because it took a month and half just to get his contract finalized.  Human Resources Director Jefferson confirmed that Feldman mentioned wanting to fill both positions permanently around the same time.

Human Resources Director Jefferson reported that there is no "hard and fast" policy on the length of time an employee may remain employed in an interim capacity.  She said prolonged interim roles are not encouraged but explained that the Finance Director position was different because there was a transition in City Managers, which is the position to whom the Finance Director reported.

At the time of ACM Hoffman's interview, the DoSD Director position had been posted but no interviews had been conducted. Hoffman reported that he did not know how long it would take to complete the process for the DoSD Director position. He explained the delay in filling the DoSD Director position permanently was because of the pandemic. Hoffman said he has also been contemporaneously involved with filling the permanent position for the Director of Technology.

## III.   OTHER ALLEGATIONS OF IMPROPER ACTION BY RESPONDENT

The Complainant provided a list of miscellaneous allegations of other improper conduct by the Respondent, including that he:

(1) Did not want to honor the City's commitment to have a joint City/County commission meeting to review the GCRA plan and directed staff to change the City's ordinance to avoid the meeting;

(2) Directed staff to call a vendor for software that exceeds the budget ($100k+) and said not to competitively bid because it was the only vendor who could provide that software, but that was not true;

(3) Presented a fuel hedge consultant from a prior relationship he had in Ft. Lauderdale and said the consultant was a sole source, but that was not true, noting that hedging is not the only way to control fuel costs and nothing was discussed with anyone before jumping to hire a consultant when GRU has a hedging team;

(4) Declined to provide direction to staff and instead instructed staff to call his former employer (Ft. Lauderdale) for direction;

(5) Directed staff to change the City's procurement policy to remove him from the "cone of silence" noting that Feldman wants to make changes unilaterally without including other charters;

(6) Directed staff not to put items on the City commission's agenda to seek approval to create or modify an ordinance and instead draft an ordinance and then seek approval on first reading;

(7) Told leadership not to listen to the legal department because they will just say no;

(8) Hired a consultant with whom he had a prior relationship to review and modify a department without discussing it with the director;

(9) Asked the budget division to find $150,000.00 for bulletproof vests for the fire department, which was not in budget;

(10)  Spent more than $700.00 per ticket for four plane tickets to Atlanta for a 1-hour meeting; and

(11)  Plans to use CRA funds for unintended purposes.

Some of these allegations were also raised by other interviewees, who expressed similar concerns. The undersigned interviewed witnesses, including the Complainant and the Respondent, concerning these allegations to determine their relationship, if any, to the

Complainant's reports of gender discrimination and retaliation. It has been determined that these allegations are not related to the Complainant's reports of gender discrimination and retaliation, are therefore outside the scope of the undersigned's investigation and we have made no findings or recommendations concerning those allegations. Details concerning these allegations and Feldman's response can be found in the undersigned's interview notes and/or interview notes reviewed by the undersigned, which are attached as Composite Exhibit 16.

# FINDINGS

## I.   GENDER DISCRIMINATION

The City's Equal Opportunity Policy Number EO-4 provides, in part, that the City does not discriminate on the basis of gender and will not tolerate any such discrimination by or against its employees. Policy EO-4 further provides numerous examples of the type of conduct that will not be tolerated. Additionally, it is the City's policy to prevent and prohibit inappropriate behavior based on an individual's gender whether or not the behavior is severe or pervasive enough to become actionable in a court of law.

Additionally, the Florida Civil Rights Act of 1992 ("FCRA") protects employees from gender discrimination in the workplace, providing, in part: "It is an unlawful employment practice for an employer: To discharge ... or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." § 760.10(1)(a), Fla. Stat. The FCRA is patterned after Title VII of the Federal Civil Rights Act of 1964 and Florida courts consider both Florida and federal decisions when evaluating discrimination claims. *Hall v. Marion Cty. Bd. of Cty. Commissioners*, 236 So. 3d 1147, 1151 (Fla. 5th DCA 2018); *see also* Civil Rights Act of 1964 § 703(a), 42 U.S.C. § 2000e-2(a) (1964).

In order to establish a prima facie case of disparate treatment based on gender discrimination, there must be a demonstration that: (1) the employee is a member of a protected class; (2) the employee was qualified for her position; (3) the employee suffered an adverse employment action; and (4) similarly situated employees outside the employee's protected class were treated more favorably. *Hall v. Marion Cty. Bd. of Cty. Commissioners*, 236 So. 3d 1147, 1151 (Fla. 5th DCA 2018) (citing *Valenzuela v. GlobeGround N. Am. LLC*, 18 So.3d 17, 21 (Fla. 3d DCA 2009)). *See also* Civil Rights Act of 1964 § 703(k), 42 U.S.C. § 2000e-2(k) (1964) ("An unlawful employment practice based on disparate impact is established under this subchapter only if ... a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of ... sex ... and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity.").

First, the evidence sufficiently establishes that Wilson's complaint is based upon her sex (female), which is a protected class.  *See* §760.10(1)(a), Fla. Stat.; Civil Rights Act of 1964 § 703(a), 42 U.S.C. § 2000e-2(a) (1964).

Second, the evidence sufficiently establishes Wilson was qualified for the position of Interim Finance Director and/or Finance Director.  The job description for the Finance Director requires a bachelor's degree in business or public administration, accounting, public finance, or related field; and eight years of progressively responsible management and supervisory experience in accounting and financial management for a governmental agency or other large entity.  A certified government finance officer (CGFO) or certified public accountant (CPA) is desirable.  Wilson possesses a bachelor's degree in business administration and has more than eight years of progressively responsible management and supervisory experience in accounting and financial management for a governmental agency.  Wilson is also a CGFO.

As to the third element, there is insufficient evidence to establish that Wilson suffered an adverse employment action as a result of the reorganization.  The Supreme Court has defined an adverse employment action as follows: "A tangible employment action constitutes significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities or a decision causing a significant change in benefits.'"  *See generally Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

"Not everything that makes an employee unhappy is an actionable adverse employment action." *See generally Vandesande v. Miami-Dade County*, 431 F. Supp. 2d 1245, 1253 (S.D. Fla. 2006) (internal citations omitted). The relevant inquiry is whether a reasonable person would view the employment action in question as adverse.  *See generally Vandesande,* 431 F. Supp. 2d at 1253 (internal citations omitted).  Wilson reported that communication from Feldman concerning the reorganization was not adequate; that she was undermined by Feldman contacting her subordinate employees; and that she was not treated fairly with regard to applying for the Finance Director position.  As it concerns poor communication by Feldman about the reorganization, such act is insufficient to establish that Wilson's compensation, terms and conditions of employment, or privileges of employment were altered.  *See* § 760.10(1)(a), Fla. Stat.; Civil Rights Act of 1964 § 703(a), 42 U.S.C. § 2000e-2(a) (1964).  While the evidence is clear that Feldman failed to communicate effectively, and that such failure led to understandable frustration and inconvenience, there is no evidence that his conduct prevented Wilson from doing her job or otherwise affected her compensation or terms and conditions of employment.

Similarly, while our investigation revealed that Feldman spoke to more lower level employees of female leaders without consulting them first than he did with lower level

employees of male leaders, there is insufficient evidence that such act constitutes an adverse employment action. Feldman contacting Wilson's subordinate, Budget Manager Fiore, and directing Fiore not to discuss potential changes to the Finance Department with Wilson, is insufficient to establish that Wilson's compensation, terms and conditions of employment, or privileges of employment were altered. It is also noted that Fiore notified Wilson of her conversation with Feldman right away, which suggests that Fiore's respect for Wilson's authority was unwavering. Additionally, while we note professional courtesies could have been extended by Feldman, his explanation that he needs to be able to communicate with any employee is reasonable.

As it concerns Wilson's application for the Finance Director position, there is insufficient evidence that Feldman was involved with the issues about which Wilson has complained. While it is unclear who made the decision to hire Baenziger's Firm, that act alone did not result in any disparate treatment of Wilson. Moreover, Baenziger's Firm was part of the qualified pool of five firms previously approved by the City for use as an executive search firm. Additionally, the issues with the job posting brochure and the job posting itself appear to have been the result of errors by, or confusion amongst, other people. As it concerns Wilson's lack of opportunity to present references, this decision appears to have been made by Baenziger and there is insufficient evidence that references were relevant to the selection of Ramos for the position. While Feldman told Bowie that he spoke with Ramos's City Manager, that person was not offered as one of Ramos's references. There is no evidence that Feldman consulted with any of Ramos's listed references.

As to the fourth element, there is insufficient evidence to establish that similarly situated employees outside the protected class (i.e., male employees) were treated more favorably than Wilson. Concerning the reorganization and allegations of circumventing the authority of female leaders, many employees that were interviewed (both males and females) reported their belief that Feldman does not communicate effectively and expressed their confusion and/or frustration about different aspects of the reorganization and related lack of communication. While there were more female employees than male employees who reported a lack of adequate communication by Feldman, and while Feldman did speak to more lower level employees of female leaders without consulting them first than he did with lower level employees of male leaders, there is insufficient evidence that his conduct was based upon the gender/sex of those employees. Rather, the undersigned concludes that it is more likely than not that the reported issues stem from poor management skills.

As it relates to disparate treatment concerning employment opportunities, there is insufficient evidence to substantiate that Feldman's actions constitute gender discrimination. The general consensus of the employees interviewed about this topic was that Persons was well-respected both inside the organization and within the community

and would be a good fit for the permanent DoSD Director position.  Feldman provided specific and detailed reasons why he wanted to hire Persons, and his explanation as to why he initially sought to direct-hire Persons, but then decided to competitively post the position.  Feldman also explained his reasons for wanting to competitively post the Finance Director position, including that he was unsure whether Wilson had all the qualities he was looking for in a Finance Director, and he wanted to see what other candidates might apply.  Feldman explained that he thought Wilson was a little too defensive of "the system" and that she did not demonstrate a desire to change processes and procedures to be more in line with current local government practices.  Additionally, Bowie said she believes Wilson is competent and qualified for the Finance Director position but there are some areas that could be improved.  ACM Murry said Wilson was doing a fairly good job but that she has some weaknesses as a manager, suggesting that she could be more aggressive.  He also pointed out that during her interview, Wilson admitted to some technical areas where she did not have expertise and was dependent upon staff.[5]

Moreover, while several witnesses confirmed the City's long history of competitively posting most positions within the organization, Feldman explained that he was unfamiliar with the City's preference to competitively bid all positions, which is inconsistent with his prior professional experience, and he ultimately reversed course and required the DoSD Director position to be competitively bid.  The undersigned believes this explanation and resulting decision to competitively post both positions is reasonable. Although there is some evidence that suggests Feldman may have promised the job to Persons despite withdrawing his initial decision to direct-hire Persons, there is insufficient evidence to determine that such promise was made.   Finally, as it concerns the timing of filling the Finance Director and DoSD Director positions, no reasonable explanation was provided as to why the Finance Director position was being posted during a pandemic and other major pending City projects, but not the DoSD Director position.  However, there is insufficient evidence to conclude that Feldman was responsible for those timing issues.   The documentary evidence suggests that Feldman directed that both positions be filled shortly after he arrived at the City.  While the undersigned was unable to determine why the Finance Director position was filled but the DoSD Director position still has not been filled (as of October 2020), there is no direct evidence that Feldman caused any delay in the posting of the DoSD Director position after he determined that the position would be competitively posted.

The undersigned finds that the Respondent's conduct suggests he is disconnected with the professional needs and desires of his colleagues and that he lacks effective communication and management skills.  However, the Respondent may be a poor manager and personalities will not always mesh in the workplace, but workplace unpleasantness on

---

[5]  While these facts provide a reasonable basis for Feldman initially wanting to competitively post the Finance Director position and not the DoSD Director position, they are insufficient to defeat Wilson's claim of retaliation, as more particularly described in Section II of the Findings below.

its own does not constitute true discrimination.  Accordingly, the undersigned finds there is <u>no cause</u> to believe that the Respondent discriminated against the Complainant based upon gender, or that a violation of City policy or applicable law occurred.

## II.   **RETALIATION**

City policy EO-5 prohibits retaliation against employees who have engaged in protected activities, including but not limited to the filing of a complaint of discrimination or harassment. Additionally, section 760.10(7), Florida Statutes, provides that "[i]t is an unlawful employment practice for an employer ... to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this section." *See also* Civil Rights Act of 1964 § 704(a), 42 U.S.C. § 2000e-3(a) (1964).

In order to establish a prima facie claim of retaliatory discrimination or discharge, there must be a demonstration of the following elements: "(1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal connection between the participation in the protected expression and the adverse action." *Jackson v. Kleen 1, LLC*, 238 So. 3d 378, 380–81 (Fla. 3d DCA 2017); *see also generally Hairston v. Gainesville Sun Pub Co.*, 9 F.3d 913, 919 (11ᵗʰ Cir. 1993) (internal citations omitted).

There is sufficient evidence to establish that Wilson engaged in a statutorily protected expression by filing a complaint of gender discrimination. *See* § 760.10(7), Fla. Stat.; Civil Rights Act of 1964 § 704(a), 42 U.S.C. § 2000e-3(a) (1964).  There is also sufficient evidence to establish that Feldman was aware that Wilson filed a complaint of gender discrimination against him before he directed ACM Murry to hire Ramos over Wilson. Feldman received a copy of Wilson's written complaint on January 15, 2020, before his direction to ACM Murry to hire Ramos several months later.  Feldman also admitted that he intended to distance himself from the hiring process based upon Wilson's complaint.

There is also sufficient evidence to establish that Wilson suffered an adverse employment action when she was not offered the position as the City's Finance Director, which would have offered her a greater salary, more responsibilities, and a more distinguishable title.  "A tangible employment action constitutes significant change in employment status such as hiring, firing, *failing to promote*, reassignment with significantly different responsibilities or a decision causing a significant change in benefits.'"  *See generally Burlington Industries, Inc. v. Ellerth*, 524 U.S 742 (1998) (Emphasis added).  Wilson was not promoted for the position despite the fact that she qualified for the position and the hiring manager, ACM Murry, recommended that she be offered the position.

Finally, there is sufficient evidence to establish a causal connection between Wilson's filing of a gender discrimination complaint against Feldman and the adverse result of not being offered the position as the City's Finance Director. A complainant "need only show 'that the protected activity and the adverse action were not wholly unrelated.'" *See generally Clover v. Total Sys. Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (internal citations omitted). The evidence uncovered during this investigation establishes that Feldman was aware of Wilson's complaint at the time he made the decision not to hire her for the Finance Director position, and he acknowledged that he should separate himself from the hiring process given that Wilson had filed a complaint against him. Nevertheless, Feldman met with the candidates, spoke to Ramos's supervisor and ignored the hiring manager's recommendation to hire Wilson. Feldman could not provide any specific information about Ramos's qualifications even though he stated he believed she was qualified. Feldman also told Bowie before the second round of interviews that he was leaning towards hiring Ramos. That statement was made notwithstanding the fact that the interview process was ongoing.

Feldman's explanation that he wanted to hire Ramos based upon interview scores is not credible because Feldman admitted that he did not know how the rankings were assembled or what they were based on. The undersigned also notes Feldman's steadfast testament that the interview scores were the sole reason for his decision to hire Ramos over Wilson. However, the difference in interview scores between Wilson and Ramos was negligible. Taking all of these things into consideration, Feldman's assertion that he selected the highest scoring candidate based solely on their interview scores is not credible.

It is also noted that while Feldman articulated that he was originally unsure whether Wilson had all the qualities he was looking for in a Finance Director, he was complimentary of Wilson's performance prior to being notified of Wilson's gender discrimination complaint. Shortly before Wilson filed her complaint of gender discrimination, Feldman told Baenziger that Wilson was doing a pretty good job and that she should be given the utmost consideration and opportunity for the position. Feldman also emailed Wilson on January 13, 2020, two days before he received a copy of Wilson's complaint of gender discrimination and told her he has never questioned her dedication and commitment and pointed out that Wilson's work ethic and participation in everything speaks for itself. *See* Exh. 10. Additionally, Feldman told Jefferson around this time that Wilson was a viable candidate and, barring someone with great experience and a CPA or someone essentially "walking on the moon," Wilson would likely be the person selected for the position.[6]

Accordingly, the undersigned finds there <u>is cause</u> to believe that Feldman retaliated against Wilson for filing a complaint of gender discrimination and that a violation of City policy occurred.

---

[6]     Jefferson was unable to provide an exact date when this comment was made by Feldman.

# <u>RECOMMENDATIONS</u>

Pursuant to the City's Office of Equal Opportunity Internal Complaint Procedures, in formulating recommendations, the Equal Opportunity Director or her designee should consider the severity of the offense, policy, past practices, and labor agreements if there is a cause determination. The undersigned reviewed the Respondent's employment contract and considered the City's past practices in formulating this recommendation.

As it concerns the undersigned's no cause determination related to the Complainant's gender discrimination complaint, the undersigned recommends the City consider reiteration of City policies concerning professionalism and continued monitoring of the workplace. The undersigned further recommends the City consider counseling the Respondent as to the goals and mission of the organization, emphasizing the importance of communication and building meaningful professional relationships as the foundation for any successful employment environment.

As it concerns the undersigned's determination concerning the Complainant's claim of retaliation, Policy EO-5 provides that the City will take corrective action that is effective and appropriate to the circumstances, including, but not limited to, disciplinary action up to and including termination of any City employee who retaliates against another employee or citizen.  The undersigned notes that retaliation is a severe offense.  Moreover, as a Charter Officer, the Respondent should be held to the highest standards.  Considering the foregoing, the undersigned recommends the City terminate the Respondent's employment. It is noted that the section 4B of the Respondent's Employment Agreement provides that the City is not obligated to provide severance pay in the event the Respondent is terminated for cause, examples of which expressly include gross negligence in the handling of City affairs; willful violation of the provisions of law; willfully disregarding a direct order or demand of the City Commission or a policy of the City; and/or conduct unbecoming a City Manager.

Pursuant to the City's Office of Equal Opportunity Internal Complaint Procedures, the City Commission shall ultimately determine the appropriate course of conduct based upon the Findings herein.

/s/ Robert Clayton Roesch
Robert Clayton Roesch
Florida Bar No. 0013931
Nicole R. Copsidas
Florida Bar No. 102886
**Shuffield, Lowman & Wilson, P.A.**
1000 Legion Place, Suite 1700

Orlando, Florida 32801
Telephone: (407) 581-9800
croesch@shuffieldlowman.com
ncopsidas@shuffieldlowman.com